All right, our final argument for today is 24-1520, U.S. Patent No. 7,679,637 LLC v. Google. Mr. Burton, please proceed. Thank you, Your Honor. I'm Dave Burton, the appellant. I am reserving five minutes for rebuttal. The technical solution that was achieved in this case was directed to a very specific problem, a specific problem with web conferencing systems, which were not able at the time to be reviewed while they were going online. What the inventor came up with was a technical way of solving that problem that started with recording two different data streams. So just like in the Contour IP case, which recently came down last year, which involved two different data streams, this case involved two different data streams, one of screen video and one of something like chat. It then had a very specific storage means and a separate client application that allowed for both reviewing the meeting while it was going online and reviewing previously recorded parts of that meeting. The district court in this case found that the abstract idea that this case was applied to was playing back recorded content. It didn't have anything to do with the first problem, which is allowing viewing a live meeting. The claim, excuse me, if the abstract idea doesn't address one of the key parts of the claim, which is that you have to allow a meeting to be reviewed while it's happening live, it can't possibly be a fair reading of what the claim is directed to, and it becomes what the court warned us to avoid doing in both the EnFish decision and in Contour IP and multiple other decisions. It becomes untethered to the claims themselves and becomes overgeneralized. And when that happens, you have exactly what happened in this case, which is an abstract idea that is so broad that it would sweep up all sorts of technologies for playing back recorded content. Is that what you just referred to? Are you comfortable with using the phrase timescale modification to refer to that? The title of the patent is time-shifted web conferencing, and so part of what it did was a separate technical advance, which was to allow speeding up parts of the previously recorded meeting. So the basic idea, I mean, obviously all of us are familiar with Zoom conferencing now or the infringing product live streaming on Google where you can join a meeting that's already in progress and have some control over how fast you want to catch up to what's going on in that meeting. That's another technical advance, and the patent, with a patentee, developed the idea of being able to make the meeting move at a faster speed so that you can catch up and join the meeting while it's going online. So the way I understand the decision below is I agree with you, first of all, that maybe the crafting of the abstract idea might be too broad, right? But setting aside from that, even if the abstract idea is, you know, or I should say the abstract idea, how they characterize what your claim is directed to was too broad. Sorry about that. So your claim seems to be more directed to the idea of being able to get into the web conference late and then to watch the meeting, and you can watch from the beginning of the meeting, and you can also make it so that meeting goes by faster so you could catch up to the real-time meeting, right? So the patent specification says that this kind of idea of watching something while it was occurring live, say a sports event, was already known, and that you also could time shift it so you could catch up to the live event faster, or in the case of baseball, maybe just make it go faster, right? And so why isn't that as applied to web conferencing an abstract idea? Well, it's an interesting question that I actually thought about reserving a lot of time for my rebuttal because I didn't know which abstract idea Google was going to argue, whether it was the district court one, which is the one I think we're reviewing, or the one where they added playing back recorded content during a live meeting, which I still think is overbroad. But to answer the question on is this combination of elements itself, I think what you're really talking about is more than that. Where is the technical solution if it's just applying old technology to a new environment? Well, because the old technology wouldn't work in the new environment. That's one reason, Your Honor. So the specific web conferencing capabilities that were developed, you couldn't just TiVo. If you could just TiVo them in a web conference, then it wouldn't be an advance. But one of the insights of the inventor was to say, Look, we're going to have to break this down into two different data streams because if we just have one data stream, that's not the way the web conferencing systems work when they're being presented. So he came up with an independent client application for the presenter side of the claim. The storage means it's detailed in the patent specification itself, and then a separate client application for the observing end that would allow viewing these two different parts while the live presentation was going on. So in other words, if I understand correctly, you'd have a data stream for the presenter talking, right, audio or maybe some video, and you'd have a data stream for the document or other thing, chat, whatever it is, that would be the other aspect that you get sometimes with web conferencing where it's not just a person speaking, but also you can see what they're presenting or see the chat comments. A hundred percent correct, Your Honor. The first part is element A of claim two, which is screen video of the presentation portion of the client application. The second part of the separate data stream is element B. It is a separate data stream, and it's described as being things like chat or looking at documents or web pages while this live presentation is ongoing. So that solution, which didn't appear in the prior art, he specifically compares it to something like TiVo, which is taking a single unified linear stream of information that's coming over TV, for example, and recording it on a single client device, you know, TiVo in your own house, that's recording a particular show. You could then rewind that particular single stream of information, but that technology would not transfer into a web conference. So the technical solution to the technical problem that's unique to web conferencing is having two data streams. Like you'd have one system to deal with the video and one system to deal with the other. That is correct. And that is part of what the district court overlooked when it reached the conclusion that the claim was directed to this abstract idea of playing back recorded content. I want to speak briefly about playing back recorded content. I do think that your adversary takes the position that that alone is not enough, that's not an inventive concept. What is your response to that? I don't think they dealt with it below, Your Honor. I don't think that they dealt with the fact that there were two different data streams involved. What they did is they said, well, there's functional claiming for each one of the two different data streams, but they didn't address the fact that the separate data streams itself was part of the technical solution to the problem. It's just not there. So we said, yeah, I think it's on page 165 of the appendix, page 4 of our response brief, and just to remind the court, this is a case that ignored the admonishment, and did this decision on a motion to dismiss without development of any other parts of the record. So in that brief, we made this exact argument about the TiVo system being linear and the solution of the inventor being breaking it down into two different data streams to allow the system to work in a web conferencing environment. So I can reserve the rest of my time for rebuttal unless there are other questions. Okay. Thank you, Mr. Burton.  May it please the court. The district court performed a comprehensive Section 101 patent eligibility analysis. Counsel, I'd like to ask what exactly you think the abstract idea is in this case, because I, like I think maybe I heard Judge Stoll saying, was a little troubled. I thought that the district court's characterization of playing back recorded content was overly generalized, and it just ignored the important claim language about being able to asynchronously observe a web conference session while the session is still going on. Sure. So we think that, or we, the, excuse me, the holding of the district court that the abstract idea is playing back recorded content, we believe that's an accurate representation of the abstract idea. What do you think the abstract idea is? Playing back recorded content. And we believe that's a direct function of the claim language itself. Is that a question of law or a question of fact? At step one, it's a question of law. Okay. So I started my question by saying, like Judge Stoll, I kind of don't agree, and I think this is an overgeneralization, and you just doubled down on it anyway. And it's a question of law, or are you de novo? Correct. So you have a backup plan. Yes, Your Honor. Okay, what's your backup plan? If we look to the claim language itself, or claim two, the language itself, our formulation of the abstract idea is a direct function of the language itself. So if we look to claim two, which is at Appendix 39, and we laid this out in our brief, and as the district court analyzed, each and every limitation is really just functional language. So it just covers the sharing of data streams. You see, I agree, and we've got a lot of cases. I'm 100% with you on the functional language. And Baterio is one versus DraftKings. We've got a lot of cases, and I have a few others here. But a lot of this international business machine, there's a whole bunch of them, and we've been really clear that you can't just use this result-oriented claim language with no specific implementation of how.  And I agree that claim two does that. Arranged to allow. Arranged to allow. How is it arranged to allow? We don't know. But is that a Step 1 issue or a Step 2 issue? And the reason it's important is because if it's a Step 2 issue, you don't even get to Step 2 unless there's an abstract idea at Step 1. So is this result-oriented functional claiming problem, which I think this claim absolutely suffers from, is that a Step 1 issue or a Step 2 issue? I'll be honest with you, I don't always know where that line is. That's fair, Your Honor. And so this court's case, I think, uses it typically as an analytical tool at Step 1 when it's analyzing a claim, and it tends to emphasize such language there. And the district court here, if I could point this court to the work of the district court, actually applied three separate tests from this court's precedent to triple-check its holding here that the claims were directed to an abstract idea. The second test they applied was analyzing the claim language to evaluate their result-oriented nature. The first, though, touches on what Chief Judge Moore, you just raised, which is what is the how here? What specific technical problem are these claims purportedly solving? And below, plaintiff merely asserted that these were directed to an abstract idea, and the district court went on to note that it struggled to discern what the specific technical solution even was here because the plaintiff didn't elaborate. So just as an initial matter, there is an issue of forfeiture, but even turning to— Okay, so I probably would have gone at your answer a little differently than you did, but we get to the same place. I would have drawn my attention, i.e. me, to Paterio, which says this result-oriented functional claiming language is part of the Step 1 inquiry, and then I would have drawn me to Hawks, Technical, which says the same thing. So I, if I were in your shoes, would have grounded me, Judge Moore, in the actual cases that make it clear that's part of the Step 1 analysis. Does that obviate the need for identifying an abstract idea? Or if you have result-oriented claiming, is that a separate way to prove ineligibility that is discrete and separate from the notion? I don't agree with the district court's broad generalization on the abstract idea. We could try and come up with another one. Or you could tell me alternatively that this is a separate vehicle for also evaluating eligibility, but that's what I'm trying to piece together is a rubric in my mind for how these different concepts fit together under our 101 eligibility law. Sure, and I think if we look to the recent cases that you just cited to me, Your Honor, like Baterio and AI Visualize, those cases seem to treat these different tests as almost a toolbox, so they're different indicators of what an abstract, if the claims are directed to an abstract idea. So even if we put aside the formulation, I take your point that you might not agree with how the district court phrased it. When you apply those three analytical tools that the district court applied here, the functional language of Step 1, whether these claims are actually directed to a specific technical solution, and third, another test analogizing to other claims that this court has held both eligible and ineligible to see what side of the line claims might fall on, the district court really engaged with that precedent and under each test reached the same conclusion that these are directed to an abstract idea. Okay, so I get all that. That's like a kitchen sink approach. Do you think, though, that we have to be able to articulate a precise abstract idea as a starting point, or do you think that this functional language tool, the how being missing from the claim, suffices on its own and we don't even need to articulate a particular abstract idea? This is me trying to figure out how to fit these things together. Sure, and frankly, Your Honor, in these cases involving data communication going back and forth, the court, I think, applies these tests and the formulation of the abstract idea is not always the initial holding. So it's not like you have to decide what the abstract idea is and then apply the test to confirm it. Aren't you supposed to be looking at where are the claims directed to, not where is the abstract idea? Yes, Your Honor. Just making sure you've got the right phraseology. Yes, Your Honor, that's correct. The test is, the inquiry is, what are the claims directed to? And then if what the claims are directed to is an abstract idea. That's correct, Your Honor. And so what do you think these claims are directed to that is an abstract idea? I think just, so if we put aside what the district court held and we look to the claim language itself, it's the manipulation of data at a high level. But looking at the claim language, it's a tether us there as we agree that we must do here. It's the sharing of data, the storing of data, the observing of data. And then that last step. You're not going to include in there that it includes being able to observe previously recorded events while the live event is still occurring? Well, I was about to reach that point, Your Honor. And that's like, that goes to like the last part about, we call that playing back record content. But it's really like taking data that's been recorded and the ability to manipulate that and review it. That's part of that playing back recorded content. I think the claim in Part E says that that's what's happening in Part F. It says actually you could watch previously recorded data even though the presentation is over. Do you read that the same way as me? Yes. So the claims allow both. Like if a meeting is ongoing, you can rewind and view the meeting or you can play it back after the meeting. But just one point to, another point to emphasize here is, Your Honor, you brought up the time modification component. And I just wanted to emphasize that the intrinsic record there, the inventor or the applicant himself admitted that he just took a preexisting time modification component. And that's, is that in the specification? Yes, it is. Is it that in itself? Yes, it's that. That's why you would say that there aren't disputed factual issues under Berkheimer, right? That's correct. That distinguishes Berkheimer from this case. Do you have a column? Yeah, it's at Appendix 38. If you look at Column 9, Lines 10 through 13, there it's discussing the audio timescale modification. And it's that last sentence that begins at Line 10 that says, you know, the first in body of the invention actually used an open source available time modification component, which reinforces that nothing really inventive here. And this is just conventional technology being applied in the technical environment. Is there anything else you think we need to know? I have a question. Thank you. There was a lot of emphasis in the opening argument on something that was different from that prior, and was the technical solution here, was having two different data streams. So I want to know your response to that, because I do think that's the crux of the argument. I do think there might be responses, but I want to know what you have to say. It's true, Your Honor. I think the two data streams point the, you know, this court's case law has dealt with similar claims. So if we look to clock technology, for example, there the court held that the claims were directed to the abstract idea of storing and displaying video. But when you look at the claims itself, multiple data streams of audio and visual information were being sent and received. And there was no inventive. That was not held to be some sort of real concept. So what about this case? It's like focusing on the facts of this case. Why is it that a person of ordinary skill in the art isn't creating something inventive by saying, oh, it would be great to be able to do this, but we've got a problem here because there's two different data streams. So we're going to have to have two different ways, two different systems for dealing with these two different data streams. So we look to the claim language right away, and that doesn't really provide any meaning. It's all in functional language. So we can turn to the specification to see if that provides any insight as to if this is a real specific technical improvement. You don't think that claims say that you have to have a first data stream and a second data stream necessarily so because there's two different types of data? We agree that states that that's claimed in the claim itself, but the specification does not make, does not say that this is specific technical improvement in the field of web conferencing. Does it have to say it's a specific technical improvement? I think as part of the directed to inquiry, when we look at what the claims are directed to, that is part of that inquiry. It's like if that is the alleged specific technical improvement. What if the specification doesn't say anything, but it just says we're using two data streams? I know what you're saying is that they didn't say, oh, this was so hard to figure out, so we realized we had to have two different data streams. You're saying there's nothing like that, but do you have any other argument besides that? Yes, Your Honor. There is actually disclosure in the specification that describes how the data streams are sent and received, and there it explains that the way data streams are actually used here is also conventional and routine, so it's not anything invented. And I point the court to Appendix 36. This is the patent. At column 5, the section on streams begins at line 24 there, and pointing to the third paragraph, it states that at line 37, the frame scheme is commonly used in the audio and visual field, which reinforces that this isn't some inventive step. The actual intrinsic record of the patent refutes that there's really anything inventive going on with how the data streams are communicated. Great. Thank you, Mr. Boulay. Mr. Burton, you have some rebuttal time. This is one of those instances when I'm actually a little afraid to speak. I agree with what I believe the court is saying, that the abstract idea found below is too broad. So reversing the district court and telling the district court that the patent is not directed to an abstract idea I think would be the correct solution in this case. One thing I do want to add in terms of conventionality is that the respondent stopped reading that paragraph in column 5, which applies what it said was a key and delta frame scheme that is used in the audio-visual field, and said you can apply that scheme to a whiteboarding session or a separate sequence of frames. So he's taking one solution, one aspect of the audio-visual and applying it to something else where it hadn't been commonly used. This entire discussion of what was or was not conventional typically is going to be done through a much more developed record than what happened in this case, which was another thing that happened below where the court did not give us an opportunity to amend the claims to address any of these issues. So apart from what's in the patent itself, there is an absence of development of the record of what was known conventional routine at the time the patent was invented. So I don't have a lot more to add, Your Honors, unless you have additional questions. Okay, no. Thank all counsel. This case is taken under submission.